**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**


TAYSIR SHEIKA                           :        CIVIL NO. 3:06CV1876 (RNC) (DFM)
    *Plaintiff*

V.

FRED LEVESQUE, ET AL.
    *Defendants*                        :        SEPTEMBER 10th, 2008


**MEMORANDUM OF LAW**
**IN OPPOSITION TO MOTION TO SUMMARY JUDGMENT**

    The plaintiff, Taysir Sheika, submits this memorandum of law in opposition to the

defendants' motion for summary judgment dated July 11, 2008. Along with this memorandum,

the plaintiff submits his own affidavit (hereinafter "Sheika affidavit") and a Local Rule 56(a)2

Statement.

**I.**    **FACTS**

    The Special Investigations Division of the New Jersey Department of Corrections

(hereinafter "NJDOC") investigated an alleged escape plan by several inmates housed at New

Jersey State Prison. Investigators allegedly determined that an inmate named Abdel Saleh, a

Palestinian and a Muslim, had solicited other inmates to help with the escape plan. (Exhibit B to

Sheika affidavit, P. 1).

The plaintiff, Taysir Sheika, also a native of Palestine and a Muslim, was Mr. Saleh's cell mate at New Jersey State Prison for about 11 years. (Sheika affidavit, Para. 3, 6; Exhibit B to Sheika affidavit, P. 1-2). Under questioning by investigators, he denied being involved in an escape plan or having any knowledge of one. (Exhibit B to Sheika affidavit, P. 2). Investigators searched the plaintiff's property, including word processor discs containing "a voluminous amount of religious (Islamic) rhetoric," but found no "direct information" linking him to the alleged escape plan. (Exhibit B to Sheika affidavit, P. 2).

Nevertheless, the plaintiff was served with a Notice of Intent to Seek Nonconsensual Interstate Transfer. In a summary of the alleged evidence supporting the transfer, the notice stated: "Search of ... Sheika's property contained both transcribed articles from religious publications and numerous files of his 'interpretations' of the Koran. Given ... Sheika's evasive actions, extensive array of Islamic writings and word processor disks [sic]. It is recommended that he be sent to a state with a low Muslim population to reduce the potential to use his knowledge of Islam inorder [sic] to influence other Muslim inmates." (Exhibit A to Sheika affidavit). A Special Investigations Division report detailed the alleged "evasive actions" as follows. The plaintiff stated that if Mr. Saleh was involved in something he would know about it. Investigators then asked what Mr. Saleh would be involved in, and the plaintiff replied "nothing." When twice asked whether he had any knowledge of a plan by Mr. Saleh to escape,

2

he first responded "why would you ask that?" and then replied "no." He twice was asked

whether he was involved in a plan to escape. In response to the first inquiry,  the plaintiff replied

that he had an opportunity to escape while housed in a county jail but chose not to do so and to

challenge his conviction in the courts. When the question was asked a second time, he replied

"no." (Exhibit B to Sheika affidavit, P. 2).

After a hearing on March 14, 2006, New Jersey officials decided to send the plaintiff out

of state. (Exhibit C to Sheika affidavit, P. 1-2). On April 24, 2006, the plaintiff was transferred

to Connecticut under the Interstate Corrections Compact. On that day, defendant Lynn Milling,

the Interstate Compact Supervisor for the Connecticut Department of Correction (hereinafter

"DOC") sent a memo to another defendant, Fred Levesque, the DOC's Director of Offender

Classification and Population Management. The memo recommended that the plaintiff be

placed in administrative segregation (hereinafter also "AS"). (Exhibit D to Sheika affidavit).

After a hearing on April 28, 2006, defendant Stephen Clapp, the hearing officer, also

recommended that the plaintiff be placed in AS, based upon "possible knowledge of conveying

explosives into NJDOC to escape." (Exhibit F to Sheika affidavit, P. 1-2). Defendant Clapp's

recommendation was accepted by defendant Levesque, who made the decision to put the

plaintiff into AS. (Exhibit G to Sheika affidavit).

Further facts will be asserted elsewhere in this memorandum.

3

## II.   ARGUMENT

### A.   SUMMARY JUDGMENT STANDARD

A party against whom a claim is asserted "may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56 (b). "Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 465 (2d Cir. 2001).

"A motion for summary judgment must be rejected 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Id., (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250. When ruling upon a motion for summary judgment, a Court is not required to make findings of fact. "The inquiry performed is the threshold inquiry of determining whether there is a need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

### B.  FACT-FINDING IS REQUIRED TO DETERMINE WHETHER PLAINTIFF HAD A PROTECTED LIBERTY INTEREST IN AVOIDING PLACEMENT IN ADMINISTRATIVE SEGREGATION

An inmate does not have a constitutional right to be confined in a particular prison or even in a particular state. Olim v. Wakinekona, 461 U.S. 238, 248 (1983). But contrary to the defendants' argument (defendants' brief, P. 11-18), this case does not involve a simple classification decision. Instead, the plaintiff alleges that the decision to place him into AS at Northern, a Level 5 Supermax prison, subjected him to conditions of confinement so harsh that they amounted to ''an atypical and significant hardship in relation to the ordinary incidents of prison life.'' (Complaint Para. 37). *See* Sandin v. Connor, 515 U.S. 472, 484 (1995). The United States Supreme Court has held that inmates have a protected liberty interest in avoiding assignment to Supermax prisons like Northern. Wilkinson v. Austin, 545 U.S. 209 (2005). While the defendants obviously are familiar with the Wilkinson decision,[1] they make no attempt to show that it is not controlling on the question of whether a protected liberty interest was impacted in the instant case.

Wilkinson involved a challenge to the process for assigning inmates to the Ohio State Penitentiary (hereinafter ''OSP''), Ohio's only Supermax prison. Given the harsh conditions at OSP and the fact that placement in it made an inmate ineligible for parole consideration, the

---

[1]The holding of Wilkinson is mentioned on page 18 of the defendants' memorandum.

5

Supreme Court held that assignment to the prison for an indefinite period of time imposes an

atypical and significant hardship. Id., at 224.  The Supreme Court described the conditions as

follows:

> In OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

> Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmates' cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

Id., at 214.

The conditions to which the plaintiff was subjected at Northern are similar to those

described in Wilkinson. Among other things, he has alleged that he was housed in his cell for 23

hours a day; his contact with other human beings was significantly limited; recreation was limited

to one hour a day five days a week; recreation in the first phase of A.S. took place in a cage;

he ate meals in his cell; programming opportunities were not available or were very limited; and

visitation was limited. (Complaint, Para. 36). The defendants have denied that these conditions

existed at Northern and that the conditions there amounted to an atypical and significant

6

hardship. (Answer, Para. 21). These are issues of material fact, which cannot be resolved by way of a motion for summary judgment. See Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998) ("In order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement, and to identify with specificity the facts upon which its conclusion is based."); Sealey v. Giltner, 116 F.3d 47, 52 (2d Cir. 1997) ("... we have indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement.").

As stated previously, the Court in Wilkinson found that an inmate had a protected liberty interest in avoiding assignment to OSP because of the harsh conditions there, combined with the fact that placement was for an indefinite period of time and rendered an inmate ineligible for parole consideration. Here, the plaintiff's confinement to AS also was for an indefinite period of time. The defendants' contention that the AS placement was a "three month period of adjustment" (defendants' memorandum, P. 7) is not supported by the facts. The plaintiff was told only that he would be "reviewed" or "considered" for removal after three months. (Exhibits F, G, I and J to Sheika affidavit). The plaintiff was sent to Northern on April 27, 2006, and he remained there until being transferred to another Connecticut prison on September 6, 2006. (Sheika affidavit, Para. 25; defendants' memorandum, P. 9). His confinement at Northern lasted for more than four months, not three. The fact that the confinement came to an end after

more than four months does not mean that it did not begin as confinement for a indefinite period of time.[2]

Rather than making him ineligible for parole consideration, the plaintiff's placement at Northern extended his sentence in a more direct way. New Jersey law allows inmates employed in prison jobs to reduce their maximum term of incarceration by "one day for each five days of productive occupation." N.J. Stat. § 30:4-92.[3] A prison job was not available to the plaintiff while he was at Northern (Sheika affidavit, Para. 45), and he was thus deprived of the opportunity to earn work credits that would have reduced his maximum term of incarceration.

### C.   IF THE PLAINTIFF HAD A PROTECTED LIBERTY INTEREST, HIS RIGHT TO DUE PROCESS WAS VIOLATED

### 1.   'Some evidence'

As the defendants acknowledge (defendants' memorandum, P. 19), "[t]he Supreme Court requires that, assuming the existence of a liberty interest, a prisoner placed in administrative segregation be provided 'some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer

--------

[2]

The defendants claim that the plaintiff was in Phase I, the most restrictive part of AS, "for about one month." (Defendants' memorandum, P. 17). But they cite no evidence to support this.

[3]A copy of this statute is attached.

8

him to administrative segregation.' " Taylor v. Rodriguez, 238 F.3d 188, 192 (2d Cir. 2001)

(quoting Hewitt v. Helms, 459 U.S. 460, 476 (1983)). It is unquestioned that the plaintiff

received a Notice of Administrative Segregation Hearing and that Defendant Clapp conducted

such a hearing on April 28, 2006. Since the decision to place the plaintiff into AS was made by

defendant Levesque, not defendant Clapp (Complaint, Para. 29; Answer, Para. 17), the

plaintiff did not have an opportunity to present his views directly to official who made the

decision to transfer him to administrative segregation.

More importantly, a decision to revoke good time credits in a prison disciplinary hearing

fails to comport with due process unless the decision is supported by "some evidence."

Superintendent v. Hill, 472 U.S. 445, 447 (1985). The Second Circuit has held that the ''some

evidence'' requirement also applies to AS hearings, as long as a protected liberty interest is at

stake. Taylor, 238 F.3d at 194. The "some evidence" standard is met if "there is any evidence

in the record that supports" the decision. Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir.

2000). But "only 'reliable' evidence can constitute 'some evidence.' " Sira v. Morton, 380

F.3d 57, 76 (2d Cir. 2004) (citing Luna v. Pico, 356 F.3d 481, 488 (2d Cir. 2004)).

The evidence considered by defendant Clapp at the plaintiff's hearing consisted of

"Memo dated 4/24/06 from Major Lynn Milling to Dir. Fred Levesque, NJDOC investigation

reports." (Restrictive Status Report of Hearing from Placement or Removal (Exhibit F to

Sheika affidavit), P. 2). The memo from defendant Milling to defendant Levesque and the

"NJDOC investigation reports" are part of Exhibit 4 of defendant Clapp's affidavit. For

convenience, the memo and reports also have been attached to the affidavit filed by the plaintiff.

(See Exhibits A through D of Sheika affidavit). The NJDOC investigative reports consist of the

following: Notice of Intent to Seek Nonconsensual Interstate Transfer (Exhibit A to Sheika

affidavit); Special Investigations Division Administrative Investigation (Exhibit B to Sheika

affidavit); and Notice of Decision Regarding Interstate Transfers (Exhibit C to Sheika affidavit).

The defendants misquote one of the documents. They state:

> Ms. Milling also received a copy of a Notice of Decision regarding Interstate
> Transfer which stated in relevant part that 'during the course of an investigation it had been
> determined that you Sheika had knowledge of an escape plan by Inmate Saleh #264942 (his
> cellmate for 11 years). It had also been determined that you Sheika maintained significant
> influence over other Muslim inmates and a strong likelihood exists that inmate Sheika along with
> inmate Saleh had planned to disrupt the security of the facility. (Defendants' memorandum, P.
> 5).

In reality, the Notice of Decision Regarding Interstate Transfer says that "during the

course of an investigation it had been determined that you Sheika _may have_ had knowledge of

an escape plan ..." (Exhibit C to Sheika affidavit, P. 1) (emphasis supplied).[4] By omitting the

words "may have," the defendants create  the false impression that the NJDOC's investigation

---

[4]

The misquotation also appears in paragraph 29 of the Defendants' Local Rule 56(a)(1)
Statement in Support of Motion for Summary Judgement.

uncovered evidence linking the plaintiff to the alleged escape plan. In fact, the investigation

concluded that "no direct information was found to prove that Sheika had been involved in

planning elements of an escape." (Exhibit B to Sheika affidavit, P. 2). Not only did the NJDOC

investigators find no "direct information," they found no indirect information either. The plaintiff

was the cell mate of a suspected plotter, both were Palestinian nationals, both were Muslim

and, according to the investigators, both had expressed hatred of Israel. In addition, the plaintiff

"had maintained an extensive array of Islamic writings ... was found to be evasive during his

interview and refused the opportunity to polygraph." (Exhibit B to Sheika affidavit, P. 2). None

of this is evidence that the plaintiff was involved in the alleged escape plan, much less reliable

evidence. "Although 'some evidence' is not much, and obviously ranks far below what would

be sufficient in a criminal or civil trial, it still must point to the accused's guilt." Lenea v. Lane,

882 F.2d 1171, 1175 (7th Cir. 1989). *See also*, Zavaro v. Coughlin, 970 F.2d 1148, 1152-53

(2d Cir. 1992) (evidence that inmate was one of 100 prisoners in mess hall during riot in which

officers said "every inmate" had participated was not sufficient under the "some evidence"

standard to support finding he actually participated in the riot). The reports that the defendants

claim justify the decision to place the plaintiff into AS do not point to his guilt. They constitute

nothing more than someone's conclusion that the plaintiff must have been involved in the alleged

escape plan, even though there was no evidence of his involvement. Conclusory statements are

11

not evidence, <u>United States v. Abrams</u>, 357 F.2d 539, 550 (1966), not even in prison hearings. *See* <u>Sira</u>, 380 F.3d at 70 ("due process requires more than a conclusory charge; an inmate must receive notice of at least some 'specific facts' underlying the accusation."); <u>Moore v. Plaster</u>, 266 F.3d 928, 932 (8th Cir. 2001) ("We do not believe such conclusory statements, without more, constitute 'some evidence' of plaintiff having violated prison rules...").

In <u>Lenea</u>, *supra*, the Seventh Circuit considered a set of facts similar to those of the instant case. Two inmates escaped from a correctional center in Illinois after obtaining bogus passes to visit the prison chapel. Lenea, who worked in the chapel, was found guilty of a disciplinary charge accusing him of aiding and abetting the escape. The defendants argued that the guilty finding was supported by "some evidence," namely that Lenea was present in the chapel on the day of the escape, that he knew the escapees and that he had given "evasive" answers on a polygraph test. The Seventh Circuit agreed with the district court, which found that "all that this 'evidence' demonstrates is that Plaintiff was properly present in the chapel when the two escapees were last seen by prison officials. If this 'evidence' proves anything, it proves only that Plaintiff had the *opportunity* to aid an escape. It is not even a modicum of evidence that he did so." <u>Lenea</u>, 882 F.2d at 1175-76 (emphasis in original).

Here, there was even less "evidence." The NJDOC reports prove only that the plaintiff was investigated in regard to the alleged escape plan and no evidence was found to link him to

12

the plan. Despite the lack of any evidence whatsoever, the NJDOC investigators and the

Connecticut defendants concluded that the plaintiff was guilty by association, because he and

Mr. Saleh shared a cell, a homeland and a religion.

### 2.   Fairness of the hearing

"Due process requires not simply that an inmate facing a loss of liberty receive a hearing,

but that he receive a fair hearing." Sira, 380 F.3d at 77 (citations omitted). A fair hearing

requires an impartial fact-finder, one whose mind is not already made up. *See* Patterson v.

Coughlin, 905 F.2d 564, 570 (2d Cir. 1990).

The Notice of Administrative Segregation Hearing served upon the plaintiff said that the

reason for the hearing was that "[i]ntelligence provided to the Connecticut Department of

Correction has identified you as a possible co-conspirator to escape plans in the New Jersey

DOC." (Exhibit E to Sheika affidavit). Since information from prison staff is likely to be

afforded greater weight than a mere denial from an accused inmate, one can hardly imagine a

stronger defense to such a charge than that prison officials investigated and found no evidence

to support it. That is exactly what the documents before defendant Clapp (the fact-finder)

showed, and yet he still recommended that the plaintiff be sent to AS. "When determining

whether there is a genuine issue of fact to be tried, the court must resolve all ambiguities and

draw all reasonable inferences in favor of the party against whom summary judgment is sought."

13

Winter v. United States, 196 F.3d 339, 346 (2d Cir. 1999). Based upon the fact that the documents considered by defendant Clapp showed that no evidence was found, it is reasonable to draw the inference that he had already made up his mind to follow the lead of defendant Milling, his superior officer,[5] and recommend that the plaintiff be sent to AS. It is difficult to conceive of anything the plaintiff could have said or produced to avoid such a recommendation.

The defendants claim that the sole reason for placing the plaintiff into AS was "Mr. Sheika's escape risk and his possible knowledge of conveying explosives into a correctional facility." (Levesque affidavit, Para. 17; Clapp affidavit, Para. 10; Milling affidavit, Para. 7). Therefore, their discussion about "risk scores" and "need scores" and "big wheels" is simply a smokescreen clouding the real issue in this case.[6] The issue is whether there was "some evidence" that the plaintiff had been involved in the alleged escape plot in New Jersey. There was no such evidence, but the plaintiff was sent to Northern anyway. Rather than being fair, the hearing was nothing more than a charade that afforded the plaintiff no opportunity to avoid the placement.

---

[5]

Defendant Clapp is a counselor supervisor. (Clapp affidavit, Para. 2). Defendant Milling holds the rank of deputy warden. (Milling affidvait, Para. 2).

[6]

Needs and risk scores are discussed on pages 7-8 of the defendants' memorandum; "big wheels" are discussed on pages 31-32.

### 3.  <u>Meaningful appeal</u>

The Supreme Court's ruling that Ohio's procedures for sending an inmate to a Supermax comported with due process was based in part on the fact that ''Ohio provides multiple layers of review for any decisions recommending OSP placement, with power to overturn the recommendation at each level. In addition to these safeguards, Ohio further reduces the risk of erroneous placement by providing for a placement review within 30 days of an inmate's initial assignment to OSP.'' <u>Wilkinson</u>, 545 U.S. at 227. The Connecticut DOC does not provide multiple levels of review. In fact, there is no meaningful review at all.

Defendant Levesque made the decision to place the plaintiff into AS. (Complaint, Para. 29; Answer, Para. 17). Pursuant to the version of DOC Administrative Directive  9.6 in effect at the time, review of the decision was through an appeal process. (Exhibit H to Sheika affidavit, P. 3, Sec. 6 (B) (2) (d)). Jeffrey E. McGill, Northern's warden, advised the plaintiff via a letter that the appeal should be made to defendant Levesque. (Exhibit G to Sheika affidavit). The plaintiff submitted such an appeal. (Sheika affidavit, Para. 31). In response, he received a letter from defendant Levesque stating that the plaintiff would remain in AS and that defendant Levesque would consider removing him

from the program after three months if he "display[ed] positive behavior."[7] (Exhibit I to Sheika affidavit). This is hardly a meaningful review that would reduce the risk of an erroneous placement. The only appeal of the decision was to the person who made the decision in the first place. Not surprisingly, the appeal was rejected.

### D.   THE DOCUMENTS CITED IN SUPPORT OF THE DECISION TO PLACE THE PLAINTIFF INTO ADMINISTRATIVE SEGREGATION PRESENT A QUESTION OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT ON HIS RETALIATION CLAIM

The Second Count of the Complaint alleges that the plaintiff was placed into AS in retaliation for his practice of Islam. " 'Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights.' " Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001) (quoting ACLU v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993)). To establish a prima facie claim for retaliation, the plaintiff bears the burden of showing that (1) he engaged in constitutionally protected conduct; (2) the defendants took adverse action against him; and (3) the constitutionally protected conduct "was a substantial or motivating factor for the adverse actions taken by prison officials." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Little

---

[7]

While admitting that defendant Levesque wrote this letter, the defendants for some reason deny that it was written in response to an "appeal," even though the DOC's own directive and Warden McGill's letter refer to the review process as an "appeal." (Complaint, Para. 39-42; Answer, Para. 21-22).

16

discussion is required in regard to the first two elements. The defendants acknowledge a

prisoner's First Amendment right to free exercise of religion (defendant's memorandum, P. 37),

and the Second Circuit has recognized that placement in AS can constitute an adverse act.

Dawes, 239 F.3d at 492 (citing Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  The

question of whether the plaintiff can establish a prima facie claim of retaliation, therefore,

depends upon whether he can show that his religion was a substantial or motivating factor in the

decision to assign him to AS.

     In her memo recommending the plaintiff's placement in AS, defendant Milling wrote:

"Both inmates [the plaintiff and Mr. Saleh] are Palestinian inmates, and are heavily involved in

the Muslim religion. Both inmates were found to have influence over other Muslim inmates."[8]

(Exhibit D to Sheika affidavit). This memo, which was the basis for the recommendation by

defendant Clapp that led to defendant Levesque's decision, creates a genuine issue of material

fact as to whether the plaintiff's religion was a substantial or motivating factor in the decision to

place him into AS.

     If a plaintiff establishes a prima facie claim for retaliation, "the defendants must show by a

preponderance of the evidence that they would have disciplined the plaintiff 'even in the

---

[8]

It should be noted that the NJDOC investigators did not say that the plaintiff had influenced
other Muslim inmates, only that it is "believed" that he "could" do so. (Exhibit B to Sheika
affidavit, P. 3).

absence of the protected conduct.' " <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996)

(citation omitted). The defendants assert that the plaintiff's placement in AS "is the same

treatment that would be given to any Connecticut inmate, whether Catholic, Jewish, Protestant,

or any other religion, who is involved in escape plans." (Defendants' memorandum, P. 28).

Whether the defendants have sent Catholic, Jewish or Protestant inmates involved in escape

plans to AS is irrelevant, because <u>the plaintiff was not involved in escape plans</u>. NJDOC

officials investigated and found no evidence linking him to the alleged escape plan. Despite the

lack of evidence, NJDOC officials decided to send the plaintiff "to a state with a low Muslim

population" in order to prevent him from using his "knowledge of Islam to influence other

inmates." (Exhibit B to Sheika affidavit, P.3). The defendants argue that "any claim of retaliation

or retaliatory transfer is better directed at New Jersey officials." (Defendants' memorandum, P.

29). But the transfer was not the only means of retaliation. The plaintiff also was retaliated

against by being placed into AS, which was done by the Connecticut defendants, not New

Jersey officials. In "recommending" that the plaintiff be placed into AS, it was defendant Milling

who stated: "Both inmates are Palestinian inmates, and are heavily involved in the Muslim

religion. Both inmates were found to have influence over other Muslim inmates." (Exhibit D to

Sheika affidavit). It is difficult to imagine a prison official making a similar statement regarding

two Catholic inmates, or two Jewish inmates, or two Protestant inmates. One would hope that

the official, in recommending AS placement of an incarcerated priest, rabbi or minister, would

not base his or her recommendation on the fact that the clergyman is "heavily involved" in his

religion and has the ability to "influence" other prisoners of the same faith. But the defendants'

brief seems to treat Islam as something different than those other faiths. In their discussion of

"big wheels," the defendants say that "leadership potential, whether it be leadership based on

hierarchies in a gang or due to the notoriety of an inmate's crime are factors that are monitored

by all prison administrators, in all states."[9] (Defendants' memorandum, P. 7). The plaintiff does

not have any particular notoriety as a result of his crime,[10] and it has never been alleged that he

is a member of a Security Risk Group. (Sheika affidavit, Para. 18). What the defendants seem

to be doing is equating the plaintiff's religion with a gang. Islam is not a gang, and influencing

others through religion is not necessarily a bad thing.

---

[9]

The defendants also say: "It is not plaintiff's religion that concerns prison officials, but rather his
leadership ability and his influence over other inmates." (Defendants' memorandum, P. 31).
Defendant Milling wrote the memo on April 24, 2006, the day the plaintiff arrived in
Connecticut from New Jersey, and the AS hearing occurred four days later. (Exhibits D and F
to Sheika affidavit). The plaintiff did not know any Connecticut inmates at the time of his
transfer to Connecticut. (Sheika affidavit, Para. 23). He was not a "big wheel" capable of
influencing other inmates who did not even know of his existence.

[10]

On July 22, 1994, the plaintiff was sentenced to a prison term of 30 to 60 years after being
convicted of felony murder, robbery and conspiracy. The conviction involved the plaintiff's
alleged role in a robbery and beating outside a restaurant that resulted in the death of the victim.
State v. Sheika, 337 N.J. Super. 228 (2001).

The defendants' suggestion to the contrary displays an animus that supports the plaintiff's claim of retaliation.

On August 22, 2007, the plaintiff was transferred back to New Jersey. (Defendants' memorandum, P. 9). This occurred after the Appellate Division of the New Jersey Superior Court ordered that another interstate transfer hearing be conducted because the the plaintiff's right to due process had been violated at the original hearing that resulted in his transfer to Connecticut. See <u>Sheika v. New Jersey Department of Corrections</u>, 395 N.J. Super. 266 (2007).[11] After the new hearing, an NJDOC disciplinary hearing officer issued a decision that read in part as follows:

The Department of Corrections does have the responsibility to act proactively, and the radicalization of inmates is seen as a legitimate concern. However, the reasons cited to support Sheika's interstate transfer are specious. No direct information was found to show that Sheika had any involvement in planning an escape. Therefore, the request to seek interstate transfer is not approved.

Notice of Decision Regarding Interstate Transfer dated October 11, 2007 (Exhibit K to Sheika affidavit), P. 3.

The Connecticut defendants used the same specious reasons to send the plaintiff to AS. It is the role of the fact-finder at trial, not this Court in ruling upon a motion for summary judgement, to determine whether the real reason for the placement was the

---

[11]A copy of this decision is attached.

plaintiff's religion, or at least whether his religion was a substantial or motivating factor in the

placement.

### E.   THE PLAINTIFF HEREBY ABANDONS THE CLAIMS IN THE THIRD COUNT OF HIS COMPLAINT

After further review of the applicable case law, the plaintiff hereby abandons the claims

made in the Third Count of the Complaint.

### F.   THE 'PHYSICAL INJURY' REQUIREMENT OF THE PRISON LITIGATION REFORM  ACT DOES NOT ENTITLE THE DEFENDANTS TO A JUDGMENT IN THEIR FAVOR

A provision of the Prison Litigation Reform Act, codified at 42 U.S.C. § 1997e (e)

states: "Limitation on recovery. No Federal civil action may be brought by a prisoner

confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered

while in custody without a prior showing of physical injury."  The plaintiff here does not allege

physical injury as a result of the constitutional violations described in his complaint.

The Second Circuit has held that because 42 U.S.C. § 1997e (e) "is a limitation on

recovery of damages for mental and emotional injury in the absence of physical injury, it does

not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or

punitive damages, or injunctive and declaratory relief." Thompson v. Carter, 284 F.3d 411,

416 (2d Cir. 2002). While acknowledging that a plaintiff alleging violation of a constitutional

right may obtain injunctive or declaratory relief and nominal or punitive damages even without a physical injury, the defendants incongruously argue they should be granted summary judgment because of the lack of an allegation of physical harm. (Defendants' memorandum, P. 33-34). They ignore the fact that "[b]oth in its text and in its caption, Section 1997e (e) purports only to limit recovery for emotional and mental injury, not entire lawsuits." Thompson, 284 F.3d at 418. Even though the plaintiff's transfer back to New Jersey makes his claims for injunction relief moot, he can still pursue other types of relief.

It was not necessary for the plaintiff to claim nominal damages in order for such damages to be available. See Irish Lesbian and Gay Organization v. Giuliani, 143 F.3d 638, 651 (2d Cir. 1998); Beyah v. Coughlin, 789 F.2d 986, 989 (2d Cir. 1986). If the plaintiff can establish that his constitutional rights were violated, it would not be necessary to prove actual injury in order to be awarded nominal damages. "Indeed, our circuit precedent holds that it is error for courts not to award nominal damages in § 1983 actions where a constitutional violation is established." Dawes, supra, 239 F.3d at 497 (Walker, C.J., writing separately). In addition, punitive damages are available in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). The complaint includes a claim for punitive damages.

## G.  THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

"Qualified immunity is the doctrine that shields government officials performing discretionary functions from being held liable for civil damages arising from their actions which do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " P.C. v. McLaughlin, 913 F.2d 1033, 1039 (2d Cir. 1990) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). A defendant is entitled to qualified immunity when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Poe v. Leonard, 282 F.3d 123, 132-33 (2d Cir. 2002) (quoting Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998)). The Second Circuit has articulated the following standards for determining whether a statutory or constitutional right has been clearly established:

For a right to be "clearly established" for purposes of qualified immunity, "it is sufficient if decisions of the Supreme Court or of the appropriate circuit have defined the contours of the right with reasonable specificity." Furthermore, a law is considered "clearly established" so long as this "circuit's decisions 'clearly foreshadow' a particular ruling on the issue." Thus, the absence of a decision by this Court or the Supreme Court directly addressing the right at issue "will not preclude a finding that the law was clearly established," at the time of the alleged violation.

Tellier v. Fields, 280 F.3d 69, 84 (2d Cir. 2000) (internal citations omitted).

The defendants argue that they "would have no way of knowing they were violating plaintiff [sic] rights, since the procedures they employed in this case, and the conditions of the

23

Northern CI have been repeatedly scrutinized by numerous courts in numerous cases since

Northern CI opened in 1995, and no court has even held that the conditions at Northern

violated any inmate's established constitutional rights." (Defendants' memorandum, P. 39). The

issue is not whether the conditions themselves violated the plaintiff's constitutional rights, but

rather whether the plaintiff had a constitutionally protected liberty interest in avoiding the

conditions because they amounted to an atypical and significant hardship. The AS hearing that

resulted in the plaintiff's placement at Northern occurred on April 28, 2006. (Clapp affidavit,

Para. 7; Restrictive Status Report of Hearing for Placement or Removal (Exhibit F to Sheika

affidavit), P. 1). Wilkinson, *supra*, in which the Supreme Court held that an inmate had a

protected liberty interest in avoiding assignment to Ohio's Supermax prison because the

conditions there constituted an atypical and significant hardship, was decided on June 13, 2005,

10 months before the plaintiff's hearing. A full decade earlier, the Supreme Court had held that

an inmate is entitled to due process protection if a  change in confinement imposes an "atypical

and significant hardship on the inmate in relation to the ordinary incidents of prison life" and the

state has granted its inmates a protected liberty interest in remaining free from such confinement.

Sandin, 515 U.S. at  483-84. In 2001, the Second Circuit, citing Hewitt v. Helms, 459 U.S.

460, 476 (1983), stated that, assuming the existence of a liberty interest,

a prisoner placed in AS has a right to due process.[12] <u>Taylor</u>, 238 F.3d at 192. Since the

defendants have not presented any evidence that the conditions at Northern, Connecticut's

Supermax prison, differ from those of its Ohio counterpart in such a way as to make

inapplicable <u>Wilkinson</u>'s holding regarding the existence of a liberty interest, at this point the

existence of such an interest must be assumed. The plaintiff's right to due process before he

could be deprived of that interest was clearly established by <u>Sandin</u>, <u>Taylor</u> and <u>Wilkinson</u>.

It is not necessary to discuss qualified immunity in regard to the plaintiff's claim that the

fact he is a Muslim was a substantial or motivating factor in the defendants' decision to place

him into A.S., because the defendants "do not question the existence ... of a convicted

prisoner's First Amendment right to free exercise of religion." (Defendants' memorandum, P.

37).

---

[12]

The defendants cite <u>Beasley v. Commissioner of Correction</u>, 50 Conn. App. 421; *aff'd* 249
Conn. 499 (1999), as holding that a inmate does not have a liberty interest in being classified to
AS. (Defendants' memorandum, P. 11-12). They misstate the holding. The petitioners in that
case had received hearings before being placed in AS. The Appellate Court simply held that
due process did not require a <u>second</u> hearing before the petitioners could be deprived of
statutory good time. <u>Beasley</u>, 50 Conn. App. at 438. ("It is undisputed that proper
administrative segregation classification hearings took place, and the petitioners now challenge
the fact that no independent hearing was held to make a determination of good time eligibility, in
which they claim to have a liberty interest.").

**III.   <u>CONCLUSION</u>**

For the foregoing reasons, the plaintiff respectfully requests that the Court deny the

defendants' motion for summary judgement in regard to the First and Second Counts of the

Complaint.

THE PLAINTIFF

<u>/s/Taysir Sheika</u>
Taysir Sheika, Pro Se
Inmate #263137/ 753320-B
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Although not appearing herein, the undersigned
assisted in the preparation of this memorandum of law:

<u>/s/Richard P. Cahill</u>
Richard P. Cahill, Esq.
Schulman & Associates
Inmates' Legal Assistance Program
78 Oak Street, P.O. Box 260237
Hartford, CT 06126-0237
Tel: (860) 246-1118
Fax: (860) 246-1119

**CERTIFICATION**

I hereby certify that a copy hereof was mailed, postage prepaid, on this 24th day of September, 2008, to the following counsel and pro se parties of records:


Steven R. Strom, Esq.
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105


/s/Taysir Sheika
Taysir Sheika

27

28